UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RAILROAD 1900, LLC, a Delaware
limited liability company,

               Plaintiff,

    v.

CITY OF SACRAMENTO, a municipal
entity,

               Defendant.

No. 2:21-cv-01673-WBS-DB

ORDER RE: MOTION TO DISMISS

----oo0oo----

This action brought under 42 U.S.C. § 1983 challenges the City of Sacramento's alleged failure to enforce anti-camping and other ordinances against homeless individuals in the area surrounding plaintiff's property. (Compl. (Docket No. 1).) Plaintiff brings federal claims alleging violation of due process (count one), violation of equal protection (count two), state-created danger (count three), uncompensated taking (count four), and municipal liability (count five), in addition to five causes

1

1 of action under California law.  (Id.)[1]

2 I.   Due Process Claim

3        "Article III of the [United States] Constitution

4 confines the federal courts to adjudicating actual 'cases' and

5 'controversies.'"  Allen v. Wright, 468 U.S. 737, 750 (1984),

6 abrogated on other grounds, Lexmark Int'l, Inc. v. Static Control

7 Components, Inc., 572 U.S. 118, 128 (2014).  "The Art. III

8 doctrine that requires a litigant to have 'standing' to invoke

9 the power of a federal court is perhaps the most important"

10 aspect of the case-or-controversy limitation.  Id.  "In essence

11 the question of standing is whether the litigant is entitled to

12 have the court decide the merits of the dispute or of particular

13 issues."  Id. at 750-51 (quoting Warth v. Seldin, 422 U.S. 490,

14 498 (1975)).[2]

15        Pursuant to the standing requirement, the Supreme Court

16 "has repeatedly held that an asserted right to have the

17 Government act in accordance with law is not sufficient, standing

18 alone, to confer jurisdiction on a federal court."  Allen, 468

19

20       [1]    At oral argument, counsel for plaintiff stated that
plaintiff had agreed to dismiss its fourth and tenth causes of
action -- alleging an unlawful taking under the Fifth Amendment
21 and inverse condemnation under the California Constitution,
respectively -- because it had determined that those claims lack
22 merit.  Thus, counsel stated, plaintiff no longer intends to
prosecute them.  Accordingly, the court will grant defendant's
23 motion to dismiss those claims.
24

25       [2]    Although the question of standing is not expressly
raised in the City's motion to dismiss, standing is essential to
26 the existence of subject matter jurisdiction, an issue which may
be raised sua sponte.  Fed. R. Civ. P. 12(h)(3) ("If the court
27 determines at any time that it lacks subject-matter jurisdiction,
the court must dismiss the action."); Snell v. Cleveland, Inc.,
28 316 F.3d 822, 826 (9th Cir. 2002).

2

1   U.S. at 754 (citing <u>Schlesinger v. Reservists Comm. to Stop the</u>

2   <u>War</u>, 418 U.S. 208 (1974); <u>Valley Forge Christian Coll. v. Ams.</u>

3   <u>United for Separation of Church and State, Inc.</u>, 454 U.S. 464

4   (1982)).  This follows from the fact that, as the Supreme Court

5   has consistently held, "a private citizen lacks a judicially

6   cognizable interest in the prosecution or nonprosecution of

7   another."  <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973)

8   (citing <u>Younger v. Harris</u>, 401 U.S. 37, 42 (1971); <u>Bailey v.</u>

9   <u>Patterson</u>, 369 U.S. 31, 33 (1962); <u>Poe v. Ullman</u>, 367 U.S. 497,

10  501 (1961)); <u>see</u> <u>Lefebure v. D'Aquilla</u>, 15 F.4th 650, 654 (5th

11  Cir. 2021) ("It is a bedrock principle of our system of

12  government that the decision to prosecute is made, not by judges

13  or crime victims, but by officials in the executive branch.  And

14  so it is not the province of the judiciary to dictate to

15  executive branch officials who shall be subject to investigation

16  or prosecution.") (citing <u>Linda R.S.</u>, 410 U.S. at 617, 619;

17  <u>United States v. Nixon</u>, 418 U.S. 683, 693 (1974)).

18          This principle extends not only to criminal

19  prosecution, but to civil enforcement as well.  <u>Doe ex rel. Doe</u>

20  <u>v. Darien Bd. of Educ.</u>, 3:11-cv-1581 (JBA), 2012 WL 4092662, at

21  *3 (D. Conn. Sept. 17, 2012); <u>Gutierrez v. City of Carson</u>, LA 10-

22  cv-7627 JAK (CWx), 2011 WL 7129239, at *7 (C.D. Cal. Dec. 16,

23  2011); <u>see, e.g.</u>, <u>Allen</u>, 468 U.S. at 739-40 (parents lacked

24  standing to sue IRS for failure to "adopt[ ] sufficient standards

25  and procedures to fulfill its obligation to deny tax-exempt

26  status to racially discriminatory private schools"); <u>In re Att'y</u>

27  <u>Disciplinary Appeal</u>, 650 F.3d 202, 203-04 (2d Cir. 2011) (client

28  lacked standing to challenge decision not to discipline client's

former attorney) (citing Linda R.S., 410 U.S. at 619); White v. City of Toledo, 217 F. Supp. 2d 838, 840 (N.D. Ohio 2002) ("The law is well established that a city's alleged failure, even if intentional, to enforce [a] speed limit does not state a § 1983 [claim] against a municipality.") (citation omitted).  § 1983 plaintiffs therefore "lack standing to seek judicial review of . . . executive decisions" not to enforce laws against other individuals.  Lefebure, 15 F.4th at 655; see id. (collecting cases); Allen, 468 U.S. at 754.  Because this is precisely what plaintiff seeks to do through this action, it lacks Article III standing to pursue its constitutional claims.

Plaintiff alleges it has been injured by the development of homeless encampments near its property and by the conduct of individuals living there.  (Compl. at ¶¶ 15-21.) However, the specific conduct by the City that plaintiff challenges is the City's "fail[ure] and refus[al] to enforce [state and local] laws" and to "clear the homeless out of this de facto containment zone."  (Id. at ¶ 16.)  Stated more directly, plaintiff challenges the City's failure to enforce its laws against homeless individuals living near plaintiff's property, and apparently seeks an injunction compelling the City to do so. (See Opp. at 1 (plaintiff challenges "Defendant's refusal to enforce its own laws and those of the state that prohibit homeless persons from loitering, vandalizing, and otherwise inhabiting and destroying Plaintiff's private property and the surrounding public property") (Docket No. 17); Compl., Prayer (seeking "[i]njunctive/equitable relief in a manner to be determined by law").)  As explained, however, plaintiff lacks

1   standing to sue the City for failing to enforce the law against

2   others because it has no judicially cognizable interest in such

3   enforcement.  See Allen, 468 U.S. at 754; Linda R.S., 410 U.S. at

4   619; Att'y Disciplinary Appeal, 650 F.3d at 203-04.

5              Plaintiff relies heavily upon the district court's

6   decision in Hunters Capital LLC v. City of Seattle, 499 F. Supp.

7   3d 888 (W.D. Wash. 2020).  The plaintiffs in that case, a group

8   of business and property owners, brought civil rights claims

9   against the city challenging its allowance of and support for the

10  "Capitol Hill Occupying Protest" ("CHOP"), a barricaded area

11  encompassing the plaintiffs' properties in which the City of

12  Seattle did not enforce local or state laws against occupying

13  protestors.  See id. at 893-99.  While the court declined to

14  dismiss most of the plaintiffs' constitutional claims, including

15  multiple claims alleging violation of due process, it did not

16  address the issue of standing.  See id. at 899-906.

17             Moreover, the plaintiffs' claims in Hunters Capital

18  were based not only on the city's alleged non-enforcement of the

19  laws, but also on the city's substantial, affirmative provision

20  of material support to the occupying protestors in establishing

21  the so-called "Autonomous Zone."  Id. at 893.  In particular, the

22  city "allegedly provided CHOP participants with medical

23  equipment, washing/sanitation facilities, portable toilets,

24  nighttime lighting, and other material support" and "fortified

25  . . . CHOP by providing participants with sturdier concrete

26  barriers" with which to block people and vehicles from entering.

27  Id. at 894-95 (internal quotation marks omitted).  The mayor also

28  "allegedly issued a statement indicating that the City . . . had

1  no plans to cease supporting CHOP and that the City was instead

2  acting to work with and preserve CHOP."  Id. at 896 (internal

3  quotation marks omitted).  The court relied on these allegations

4  in concluding that the plaintiffs had "plausibly allege[d] . . .

5  that the City's affirmative actions in support of CHOP" caused a

6  deprivation of the plaintiffs' constitutionally protected

7  property interests and thus sufficiently alleged a violation of

8  due process.  See id. at 900-01.

9          In contrast, plaintiff in the present case does not

10 allege that the City engaged in any affirmative conduct to

11 support the development of the homeless encampments beyond the

12 alleged non-enforcement decision itself.  (See Compl. at ¶¶ 14-

13 25)³; White v. City of Minneapolis, 21-cv-371 (WMW/KMM), 2021 WL

14 5964554, at *1-2 & n.1 (D. Minn. Dec. 16, 2021) (distinguishing

15 Hunters Capital, in due process § 1983 action challenging city's

16 failure to provide police protection during protest, leading to

17 burning of plaintiff's business, on ground that plaintiffs did

18 not allege city "actively supported any third-party agitators[,]

19 whether by providing resources . . . or by issuing public

20 statements in which they expressed a desire to preserve the

21 unrest").  This alone is insufficient to demonstrate a judicially

22 cognizable interest, which is necessary to confer standing upon

23 plaintiff.  See Allen, 468 U.S. at 750-51, 754; Linda R.S., 410

24 U.S. at 619; Lefebure, 15 F.4th at 655.

25 II.  State-Created Danger Claim

26          Plaintiff also brings a separate claim alleging state-

27 _____

28        ³    Indeed, plaintiff acknowledges that the City cleared
   the area on at least one occasion.  (Id. at ¶ 22.)

1 | created danger, a type of due process violation.  See Martinez v.
2 | City of Clovis, 943 F.3d 1260, 1271 (9th Cir. 2019).  Like
3 | plaintiff's first due process claim, the crux of the state-
4 | created danger claim is that the City has created dangerous
5 | conditions, to which plaintiff has been exposed, by failing to
6 | enforce its laws against homeless individuals residing near
7 | plaintiff's property.  (See Compl. at ¶¶ 14-21, 29-31.)  Thus,
8 | this claim likewise directly challenges the City's failure to
9 | enforce the law against others, and therefore plaintiff also
10 | lacks standing to pursue it.

11 | This claim fails for other reasons as well.  Under the
12 | state-created danger rule, "the state may be constitutionally
13 | required to protect a plaintiff that it 'affirmatively places in
14 | danger by acting with deliberate indifference to a known or
15 | obvious danger.'"  Martinez, 943 F.3d at 1271 (quoting Patel v.
16 | Kent Sch. Dist., 648 F.3d 965, 971-72 (9th Cir. 2011)).  To
17 | succeed on a state-created danger claim, a plaintiff must show,
18 | inter alia, that "the [defendant's] affirmative actions created
19 | or exposed [the plaintiff] to an actual, particularized danger
20 | that [the plaintiff] would not otherwise have faced" and that the
21 | danger resulted in a foreseeable injury to the plaintiff.  See
22 | id. (citing Hernandez v. City of San Jose, 897 F.3d 1125, 1133
23 | (9th Cir. 2018)).  Whether the defendant created a new danger or
24 | enhanced an existing one is not material; the focus is on whether
25 | there was "state action [versus] inaction in placing an
26 | individual at risk."  See Hernandez, 897 F.3d at 1134-35 (quoting
27 | Penilla v. City of Huntington Park, 115 F.3d 707, 710 (9th Cir.
28 | 1997)); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1063 n.4

1    (9th Cir. 2006).

2            According to plaintiff's Complaint, the affirmative

3    action which caused the danger to plaintiff was the City's

4    "decision to treat the area surrounding [plaintiff's] Property as

5    a containment zone" and its "fail[ure] and refus[al] to enforce"

6    state and local laws; and the "danger" created thereby consisted

7    of public health and safety hazards, harmful environmental

8    conditions and increased crime and risk of property damage.

9    (Compl. at ¶¶ 15-20.)  Specifically, plaintiff alleges that, due

10   to this danger, it was injured when "[t]he homeless . . . lit the

11   Property on fire and vandalized it in a variety of other ways,"

12   when its "tenants and their patrons [were made] to fear for their

13   safety" due to drug use and odors, and when it was "forced to

14   expend additional monetary resources on third-party security and

15   cleanup crews" to "repair[ ] fire damage and other vandalism

16   carried out by the homeless population."  (Compl. at ¶¶ 18-20.)[4]

17           As an initial matter, it is not clear that the term

18   "danger" may, within the meaning of the state-created danger

19   doctrine, be validly construed to include risks of purely

20   economic injury to a corporation.  Every Ninth Circuit decision

21   of which this court is aware in which the court recognized a

22   claim for state-created danger involved risks of bodily harm to

23   individuals.  See Hernandez, 897 F.3d at 1133-39 (noting focus of

24   analysis is whether "state action . . . placed an individual at

25   

26       [4]   Plaintiff also alleges that, because of the City's
     failures, it has been "threaten[ed]" with "an increased risk of
27   infection of COVID-19" and "loss of business and other
     opportunities," though it does not allege that these threatened
28   harms have yet been realized.  (See id. at ¶ 21.)

1    risk) (emphasis added); <u>Henry A. v. Willden</u>, 678 F.3d 991, 1002-

2    1003 (9th Cir. 2012); <u>Kennedy</u>, 439 F.3d at 1061-67; <u>Munger v.</u>

3    <u>City of Glasgow Police Dep't</u>, 227 F.3d 1082, 1086-88 (9th Cir.

4    2000); <u>Penilla</u>, 115 F.3d at 709-10; <u>L.W. v. Grubbs</u>, 974 F.2d 119,

5    120-23 (9th Cir. 1992); <u>Wood v. Ostrander</u>, 879 F.2d 583, 587-96

6    (9th Cir. 1989); <u>see also</u> <u>Martinez</u>, 943 F.3d at 1271-77 (holding

7    individual plaintiff had demonstrated a valid claim for state-

8    created danger based on physical injury, but ruling for

9    defendants based on qualified immunity where relevant law was not

10   clearly established); <u>Pauluk v. Savage</u>, 836 F.3d 1117, 1121-26

11   (9th Cir. 2016) (same).

12          It is also doubtful that the Supreme Court in <u>DeShaney</u>

13   <u>v. Winnebago County Social Services Department</u>, 489 U.S. 189

14   (1989) -- the progenitor of the state-created danger doctrine,

15   <u>see</u> <u>id.</u> at 201 -- intended to allow § 1983 liability based on

16   economic harms to non-individual plaintiffs, given that that case

17   involved the infliction of bodily harm to a child.  <u>Id.</u> at 192;

18   <u>see</u> <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 842 (1998)

19   (noting that the Court "ha[s] always been reluctant to expand the

20   concept of substantive due process") (quoting <u>Collins v. City of</u>

21   <u>Harker Heights</u>, 503 U.S. 115, 125 (1992)).  The only decision

22   plaintiff identifies to have done so, <u>Hunters Capital</u>, is not

23   binding and, more importantly, did not address this issue.  (Opp.

24   at 6-7); <u>see</u> 499 F. Supp. 3d at 901-03.

25          More importantly, plaintiff fails to plausibly allege

26   that any danger it faced was caused by an "affirmative action[ ]"

27   by the City, as that term has been defined by the courts.

28   Plaintiff describes the City's non-enforcement as a "decision,"

1    which it argues amounts to "affirmatively treating the area

2    surrounding [plaintiff's] property as a containment zone" and

3    "affirmatively refus[ing] to enforce its own laws and those of

4    the state."  (Compl. at ¶ 15; Opp. at 7.)  That the City may have

5    knowingly declined to enforce the law does not transform its non-

6    enforcement from inaction into an affirmative act, nor does

7    merely labeling such inaction "affirmative[ ]."  See Lamberth v.

8    Clark Cnty. Sch. Dist., 2:14-cv-2044-APG, 2015 WL 4760696, at *5

9    (D. Nev. Aug. 12, 2015) ("[Defendants' alleged] omissions do not

10   qualify as affirmative acts.  Regardless of how it is phrased,

11   the substance of these claims is that the defendants failed to

12   render aid."), aff'd, 698 F. App'x 387 (9th Cir. 2017); Estate of

13   Gonzales v. Hickman, ED 05-cv-660 MMM (RCx), 2006 WL 4959780, at

14   *14 (C.D. Cal. Jan. 30, 2006) ("Inserting the word 'refusal'

15   . . . does not transform an omission into an affirmative act.");

16   Johnson v. City of Seattle, 385 F. Supp. 2d 1091, 1097 (W.D.

17   Wash. 2005), aff'd, 474 F.3d 634 (9th Cir. 2007).

18          Municipalities and the officials who enforce their laws

19   are routinely required to make decisions about whether and when

20   to do so.  However, to hold that decisions not to enforce laws

21   constitute "affirmative action" for purposes of state-created

22   danger claims would impermissibly expand the scope of due process

23   liability by allowing any mere omission to be reframed as

24   actionable affirmative conduct.  Ninth Circuit precedent

25   recognizing claims for state-created danger makes clear that the

26   official conduct in question must be affirmative in a more

27   literal sense.  See, e.g., Hernandez, 897 F.3d at 1133-35

28   (directing rally attendees toward violent crowd and blocking them

10

1   from exiting through other routes); Kennedy, 439 F.3d at 1063

2   (verbally disclosing child molestation allegations to accused

3   individual's parent); Munger, 227 F.3d at 1087 (ejecting patron

4   from bar); Penilla, 115 F.3d at 708, 710 (canceling paramedic

5   request, breaking lock on door of plaintiff's home, and placing

6   plaintiff inside).  Because allegations of actual affirmative

7   conduct are absent from plaintiff's complaint, it fails to state

8   a claim for state-created danger.  That claim will accordingly be

9   dismissed.

10  III. Equal Protection Claim

11        In certain circumstances, an exception to the rule

12  prohibiting constitutional challenges to lack of enforcement of

13  the law may exist for equal protection claims alleging that

14  enforcement of the law is done selectively for a discriminatory

15  purpose and with a discriminatory effect.  See Lacey v. Maricopa

16  Cnty., 693 F.3d 896, 920 (9th Cir. 2012); Rosenbaum v. City &

17  Cnty. of San Francisco, 484 F.3d 1142, 1152 (9th Cir. 2007).

18  Such claims may proceed where a plaintiff alleges that a law was

19  enforced against the plaintiff, but not against other similarly

20  situated individuals, and that the defendant "decided to enforce

21  the law against [the plaintiff] 'on the basis of an impermissible

22  ground such as race, religion or exercise of constitutional

23  rights.'"  See Lacey, 693 F.3d at 922 (quoting United States v.

24  Kidder, 869 F.2d 1328, 1336 (9th Cir. 1989)) (alteration

25  adopted); United States v. Armstrong, 517 U.S. 456, 464-65 (1996)

26  ("A [litigant] may demonstrate that the administration of a . . .

27  law is 'directed so exclusively against a particular class of

28  persons . . . with a mind so unequal and oppressive' that the

1  system of [enforcement] amounts to 'a practical denial' of equal

2  protection of the law.") (quoting Yick Wo v. Hopkins, 118 U.S.

3  356, 373 (1886)).

4          Here, however, the basis of plaintiff's equal

5  protection claim is not that any law was enforced against it.

6  Rather, it alleges that the City enforces certain ordinances

7  against some homeless individuals but not against others.

8  Crucially, plaintiff is part of neither group, and it has

9  identified no authority establishing that it may bring a

10  selective enforcement claim without alleging that it has itself

11  been the subject of the challenged enforcement.  See Lacey, 693

12  F.3d at 922; Allen, 468 U.S. 755 ("Our cases make clear . . .

13  that . . . injury [resulting from discrimination] accords a basis

14  for standing only to 'those persons who are personally denied

15  equal treatment' by the challenged discriminatory conduct.")

16  (quoting Heckler v. Mathews, 465 U.S. 728, 739-40 (1984)); cf.

17  Warth, 422 U.S. at 499 ("[E]ven when the plaintiff has alleged

18  injury sufficient to meet the 'case or controversy' requirement,

19  this Court has held that the plaintiff generally must assert his

20  own legal rights and interests, and cannot rest his claim to

21  relief on the legal rights or interests of third parties.").[5]

22  _____

23  [5]    Even if plaintiff could make out a claim that it has
   itself been the target of unlawful selective enforcement of the
   law, plaintiff also has not alleged that the non-enforcement

24  decision was made "on the basis of an impermissible ground such
   as race, religion or exercise of constitutional rights."  Kidder,

25  869 F.2d at 1136 (citation omitted, alteration adopted); (see

26  Opp. at 5-6 (quoting J.D.H. v. Las Vegas Metro Police Dep't,
   2:13-cv-1300 APG NJK, 2014 WL 3809131, at *4 (D. Nev. Aug. 1,

27  2014))).
           Nor does plaintiff appear to assert an equal protection

28  claim as a "class of one."  Such a claim may lie "where the

1    Nor has plaintiff identified any authority establishing

2  that cities are required, as a matter of equal protection law, to

3  treat all areas of the city alike.  While it may be unfair for a

4  city to afford businesses and residents in certain areas the

5  benefit of enforcing local laws while denying that benefit to

6  those in other areas, as plaintiff argues, it does not amount to

7  a violation of equal protection.  The court is aware of, and

8  plaintiff has identified, no precedent demonstrating that it

9  does, and to hold otherwise would expand the scope of the Equal

10  Protection Clause in ways this court lacks the authority to

11  extend it.  Accordingly, plaintiff's equal protection claim must

12  also be dismissed.[6]

13

14  plaintiff alleges that [the plaintiff] has been intentionally
treated differently from others similarly situated and that there
15  is no rational basis for the difference in treatment."  Vill. of
Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  "Where a
16  plaintiff is making a class-of-one claim, the essence of the
claim is that only the plaintiff has been discriminated against,
17  and therefore the basis for the differential treatment might well
have been because the plaintiff was unique . . . ."  Scocca v.
18  Smith, 11-cv-1318 EMC, 2012 WL 2375203, at *5 (N.D. Cal. June 22,
19  2012).

    Here, plaintiff does not allege that it has been
20  singled out for differential treatment, but rather that the City
has, on a city-wide scale, "arbitrarily determined where homeless
21  encampments may or may not be located and what communities should
be affected," thereby "plac[ing] a disproportionate burden on
22  some persons, communities, and businesses over others."  (Compl.
at ¶ 27.)  Such allegations cannot support a class-of-one claim.
23  Cf. Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir.
24  2005) ("An equal protection claim will not lie by conflating all
persons not injured into a preferred class receiving better
25  treatment than the plaintiff.") (citation and internal quotation
marks omitted).
26

27    [6]    Plaintiff also asserts a claim for municipal liability
premised upon an unconstitutional custom or policy.  (Compl. at
28  ¶¶ 35-38.)  However, municipal liability under § 1983, recognized

13

1    IV.   State Law Claims

2            Because the court will dismiss plaintiff's federal

3    claims, it no longer has federal question jurisdiction.[7]   Federal

4    courts have "supplemental jurisdiction over all other claims that

5    are so related to claims in the action within such original

6    jurisdiction that they form part of the same case or controversy

7    under Article III of the United States Constitution."   28 U.S.C.

8    § 1367(a).   A district court "may decline to exercise

9    supplemental jurisdiction . . . [if] the district court has

10   dismissed all claims over which it has original jurisdiction."

11   Id. at § 1367(c); see also Acri v. Varian Assocs., Inc., 114 F.3d

12   999, 1001 n.3 (9th Cir. 1997) (en banc) (district courts may

13   decline sua sponte to exercise supplemental jurisdiction).

14           "[I]n the usual case in which all federal-law claims

15   are eliminated before trial, the balance of factors to be

16   considered under the pendent jurisdiction doctrine -- judicial

17   economy, convenience, fairness and comity -- will point toward

18   declining to exercise jurisdiction over the remaining state-law

19   claims."   Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7

20   (1988).   Here, comity strongly weighs in favor of declining to

---

in Monell v. Department of Social Services of City of New York,
436 U.S. 658 (1978), is simply a means of suing a municipality
for violations of constitutional rights, not an independent claim
of its own.   Because all of plaintiff's constitutional claims are
asserted against the City -- the only defendant in this action --
the claim for municipal liability is redundant of the others, and
will thus be dismissed for the same reasons.

[7]      There is no diversity jurisdiction in this case.
Although plaintiff is a Delaware corporation, and thus the
parties are of diverse citizenship, neither party alleges that
the amount in controversy exceeds $75,000.   (Prayer (Docket No.
1)); see 28 U.S.C. § 1332(a).

1 exercise supplemental jurisdiction over plaintiff's state law

2 claims.  The state courts are fully competent to adjudicate such

3 claims.  Some of plaintiff's claims raise complex questions of

4 state law, such as the right to "pursuing and obtaining safety

5 [and] happiness" under the California Constitution, which are

6 better left for California courts to resolve.

7         As for judicial economy, plaintiff's state law claims

8 have not been the subject of any significant litigation in this

9 case, as this is the first instance in which the merits of

10 plaintiff's claims are being considered.  Judicial economy does

11 not weigh in favor of exercising supplemental jurisdiction.

12         Finally, convenience and fairness do not weigh in favor

13 of exercising supplemental jurisdiction over plaintiff's

14 remaining state law claims.  The federal and state fora are

15 equally convenient for the parties.  There is no reason to doubt

16 that the state court will provide an equally fair adjudication of

17 the issues.  There is nothing to prevent plaintiff from refiling

18 its state law claims against the City in state court, and any

19 additional cost or delay resulting therefrom should be minimal.

20         Accordingly, the court declines to exercise

21 supplemental jurisdiction and will dismiss plaintiff's remaining

22 state law claims.  In so doing, this court passes no judgment on

23 the merits of plaintiff's state law claims.  Not all wrongs can

24 be remedied by resort to the federal courts.  Plaintiff is still

25 free to seek accountability for harms arising from the City's

26 alleged non-enforcement of its laws through plaintiff's state law

27 claims or through the democratic process.  As Chief Justice

28 Rehnquist observed in DeShaney:

1           The people . . . may well prefer a system of liability
       which would place upon the State and its officials the
2           responsibility for failure to act in situations such
       as the present one.  They may create such a system, if
3           they do not have it already, by changing the tort law
       of the State in accordance with the regular lawmaking
4           process.  But they should not have it thrust upon them
       by this Court's expansion of . . . the Fourteenth
5           Amendment.

6    489 U.S. at 203.

7          IT IS THEREFORE ORDERED that defendant's motion to

8    dismiss (Docket No. 11-1) be, and the same hereby is, GRANTED.

9    Plaintiff has twenty days from the date of this Order to file an

10   amended complaint, if it can do so consistent with this Order.

11   If plaintiff should elect not to file an amended complaint by

12   that date the Clerk shall enter final judgment of dismissal on

13   this Order.

14   Dated:  May 26, 2022
             WILLIAM B. SHUBB
15               UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28