1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   RAILROAD 1900, LLC, a Delaware          No. 2:21-cv-01673 WBS DB
     limited liability company,
13
                  Plaintiff,
14                                           ORDER RE: DEFENDANT'S MOTION
          v.                                 FOR SUMMARY JUDGMENT
15
     CITY OF SACRAMENTO, a municipal
16   entity,

17                Defendant.

18

19                              ----oo0oo----

20          Plaintiff Railroad 1900, LLC ("Railroad 1900") brings

21   this action against defendant the City of Sacramento ("City"),

22   alleging violations of due process (Claims 1-2), municipal

23   liability for unconstitutional customs and policies (Claim 3),

24   and various state law claims (Claims 4-7).  The core of

25   plaintiff's claims challenges the City's alleged failure to

26   enforce anti-camping and other ordinances against homeless

27   individuals in the area surrounding plaintiff's property.

28   (Second Am. Compl. ("SAC") (Docket No. 34).)  The City now moves

                                    1

1 for summary judgment.  (Mot. for Summ. J. ("MSJ") (Docket No.
2 47).)

3 I.   Factual Background

4        Plaintiff owns commercial real estate at 1900, 1955,
5 and 1957 Railroad Drive in Sacramento, California, which
6 plaintiff acquired in May 2018.  (Eaton Decl. (Docket No. 55-6) ¶
7 2.)  In December 2017, shortly before plaintiff purchased the
8 property, the City opened an emergency homeless shelter on
9 Railroad Drive.  (Id. ¶ 3.)  The City closed it around April
10 2019.  (Id.)

11       At around the time the shelter closed, Railroad Drive
12 experienced a surge in homeless encampments and abandoned
13 vehicles.  (Id. ¶ 6 and Ex. 1.)  Plaintiff has since suffered
14 extensive property damage and economic loss, inflicted
15 principally by the homeless population encamped in Railroad
16 Drive.  (Id. ¶ 15.)  From 2019 to the present, plaintiff has
17 contacted the City hundreds of times, repeatedly requesting that
18 the City enforce its laws and ordinances on Railroad Drive.  (Id.
19 ¶ 10 and Ex. 4.)  A significant portion of plaintiff's requests
20 concerned vehicles on Railroad Drive that were either wrecked or
21 being used as shelter by homeless individuals.  (Mendez Decl.
22 (Docket No. 47-4) Ex. C.)

23       The City has various units and divisions that process
24 complaints and concerns about Sacramento's homeless population.
25 One is the Sacramento Police Department's Impact Unit.  (Heinlein
26 Decl. (Docket No. 47-6) ¶ 2.)  The Impact Unit responds to
27 complaints of illegal activity in and around encampments.  (Id.)
28 It is also responsible for enforcing Sacramento's Critical

Infrastructure Ordinance (S.C.C. c. 8.140) and the Sidewalk Obstructions and Pedestrian Interference Ordinance (id. c. 12.24), which prohibit camping on or otherwise obstructing sidewalks and critical city infrastructure.  (Id. ¶¶ 3-6.)  In that capacity, the Impact Unit seeks voluntary removal of encampments in violation of city ordinances; as a second resort, it will move individuals and their possessions forcibly.  (Id.)

Another City entity that interacts with the homeless population is the Department of Community Response ("DCR").  DCR employees are trained to answer various emergency calls, including those regarding homeless encampments.  (Worrall Decl. (Docket No. 47-5) ¶ 3.)  DCR does not provide sterile needles for homeless individuals to use.  (Id. ¶ 5.)  DCR provides trash bags to homeless individuals when they indicate they want to clean their area.  (Id.)  During high temperatures, DCR will hand out individual water bottles to homeless individuals, but not as a regular service or at large scale.  (Id.)

Another City entity is the Community Development Department, which has a Code Compliance Division ("Code Compliance").  (Mendez Decl. ¶¶ 1-2.)  Code Compliance administers a vehicle abatement program.  This program seeks to tow and dispose of vehicles that are a public nuisance.  (Id. ¶ 3.)  Nuisance vehicles include those vehicles are abandoned, wrecked, dismantled, or otherwise illegally parked.  (Id.)  If Code Compliance receives a complaint about an unmoved vehicle, Code Compliance tags it, then tows it 72 hours later if it remains unmoved.  (Id. ¶ 4.)

In the past five years, Code Compliance has received

around 20,000 abandoned vehicle complaints per year.  (Mendez Decl. ¶ 6.)   Around 10% of complaints ultimately ended in vehicle abatement.  (Id. ¶ 5.)  Code Compliance employs around 12 to 15 enforcement officers.  (Id. ¶ 6.)  Due to the sheer volume of complaints and abandoned vehicles, Code Compliance utilizes a triage system that prioritizes complaints posing possible life and safety concerns.  (Id. ¶ 7.)

On March 19, 2020, Sacramento County's Public Health Officer issued a stay-at-home order due to the arrival of the COVID-19 pandemic.  (Mendez Decl. ¶ 8 and Ex. A.)  The order did not prevent the performance of "Essential Governmental Functions" as determined by each governmental entity.  (Id. Ex. A § 10(e).)

On June 1, 2021, the Public Health Officer issued another order, this time advising local governments against citing homeless individuals living in vehicles during community spread of COVID-19, except where encampments pose a public safety hazard or threaten critical infrastructure.  (Id. Ex. B ¶ 6.) The order expired two weeks later, on June 15, 2021.  (Id. Ex. B ¶ 7.)

In response to these two orders, Code Compliance did not tow any nuisance vehicles being used as shelter between March 19, 2020 and June 15, 2021, except in cases involving public safety concerns.  (Id. ¶ 10.)  Notwithstanding the orders, Code Compliance responded to complaints about nuisance vehicles not used for shelter.  (Id. ¶¶ 12-13.)  Code Compliance specifically responded to complaints from plaintiff about nuisance vehicles on Railroad Drive on thirteen occasions between January and

4

1    September of 2021.[1]  (Id. ¶ 12.)

2    II.  Legal Standard

3          Summary judgment is proper "if the movant shows that

4    there is no genuine dispute as to any material fact and the

5    movant is entitled to judgment as a matter of law."  Fed. R. Civ.

6    P. 56(a).  A material fact is one that could affect the outcome

7    of the suit, and a genuine issue is one that could permit a

8    reasonable trier of fact to enter a verdict in the non-moving

9    party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10   248 (1986).

11         The movant bears the initial burden of demonstrating

12   the absence of a genuine issue of material fact as to the basis

13   for the motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

14   (1986).  The moving party can satisfy its burden by presenting

15   evidence that negates an essential element of the nonmoving

16   party's case.  Celotex Corp, 477 U.S. at 322–23.  Alternatively,

17   the movant can demonstrate that the non-moving party cannot

18   provide evidence to support an essential element upon which it

19   will bear the burden of proof at trial.  Id.  The burden then

20   shifts to the non-moving party to set forth specific facts to

21   show that there is a genuine issue for trial.  See id. at 324.

22   Any inferences drawn from the underlying facts must, however, be

23   viewed in the light most favorable to the non-moving party.  See

24   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

25   587 (1986).

26

27         [1]   What constituted a "response," and whether it involved
     towing any vehicles, is left unclear.  (See Eaton Decl. ¶ 12.)
28

                                    5

1    III. <u>Evidentiary Objections</u>

2           Plaintiff and the City assert various evidentiary

3    objections against each other's statements of material facts.

4    (Docket Nos. 55-3, 56-2.)

5           As a preliminary matter, the court will disregard any

6    objections that are duplicative of the summary judgment standard.

7    Under Federal Rule of Evidence 401, evidence is relevant if it

8    "has any tendency to make a fact more or less probable" and that

9    fact "is of consequence in determining the action."  Fed. R.

10   Evid. 401.  The action before the court now is a motion for

11   summary judgment.  On summary judgment, the court determines

12   whether the evidence presented, viewed in the light most

13   favorable to the non-moving party, creates a "genuine dispute as

14   to any material fact" that must be resolved at trial.  Fed. R.

15   Civ. P. 56(a).  The court must therefore consider, and only

16   consider, evidence bearing on (1) facts that are (2) material.

17   If the evidence offered does not bear on a material fact (<u>e.g.,</u>

18   comprises baseless speculation, bears on a legal conclusion, or

19   bears on a fact not necessary to dispose of any claim), it is by

20   definition not relevant to the present action for summary

21   judgment.  <u>Sandoval v. Cnty. of San Diego</u>, 985 F.3d 657, 665 (9th

22   Cir. 2021) ("[O]bjections for relevance are generally unnecessary

23   on summary judgment because they are "'duplicative of the summary

24   judgment standard itself.' . . . [P]arties briefing summary

25   judgment motions would be better served to 'simply <u>argue</u>' the

26   import of the facts reflected in the evidence rather than

27   expending time and resources compiling laundry lists of relevance

28   objections.") (citing <u>Burch v. Regents of Univ. of Cal.</u>, 433 F.

1  Supp. 2d 1110, 1119 (E.D. Cal. 2006) (Shubb, J.)).

2          Additionally, "if the contents of a document can be
3  presented in a form that would be admissible at trial -- for
4  example, through live testimony by the author of the document --
5  the mere fact that the document itself might be excludable
6  hearsay provides no basis for refusing to consider it on summary
7  judgment."  Id. at 666.

8          Accordingly, the court will overrule plaintiff's
9  objections to portions of the City's declarations and exhibits
10  attached to them.[2]  Every declarant represents that they have
11  personal knowledge of the facts stated within their declaration
12  and that they are able to competently testify to them at trial.
13  (See Mendez Decl. ¶ 1; Worrall Decl. ¶ 1; Heinlein Decl. ¶ 1.)
14  Further, every declarant is employed in a managerial/oversight
15  capacity at their respective organizations, and on this basis
16  attests to their organization's policies, reports, and data.
17  (Id.)  Absent any challenges to the substantive authenticity or
18  reliability of these declarations, the court will not exclude
19  them from its analysis of plaintiff's claims.  Plaintiff would be
20  better served if its counsel centered on meaningful problems with
21  the content of the evidence and allowed the court to focus on the
22  merits of its arguments.

23  IV.  Discussion

24          Plaintiff brings federal and state claims against the
25  City.  The federal claims (Claims 1-3) are brought under Section

26  _____

27          [2]  The City's evidentiary objections to plaintiff's
   declaration and exhibits bear on facts that are not material to
   the court's disposition of plaintiff's claims.

28

1983 and allege substantive due process violations.  The court
previously dismissed these claims with leave to amend because
plaintiff failed to allege any affirmative acts by the City that
could confer plaintiff with standing to sue.[3]  (See Order (Docket
No. 27).)

    A.   Due Process (Claim 1)

It is well established that, as a general principle,
plaintiffs cannot sue the government for failing to enforce its
laws.  Allen v. Wright, 468 U.S. 737, 754 (1984) ("[The Supreme
Court] has repeatedly held that an asserted right to have the
Government act in accordance with law is not sufficient, standing
alone, to confer jurisdiction on a federal court."); see also
Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private
citizen lacks a judicially cognizable interest in the prosecution
or nonprosecution of another.") (citing Younger v. Harris, 401
U.S. 37, 42 (1971)).

The court previously dismissed this claim with leave to
amend for lack of a cognizable judicial controversy.  (See Order
at 2-6.)  To the extent that plaintiff's due process claim is
still predicated on the City's alleged failure to perform any

---

[3]     Previously, the court dismissed the federal claims in
the initial complaint with leave to amend.  Those federal claims
were all brought under Section 1983, alleging violations of Due
Process (Claims 1, 3), Equal Protection (Claim 2), Uncompensated
Taking (Claim 4) and Monell (Claim 5).  (Docket No. 1.)  The
court declined supplemental jurisdiction over the state law
claims.  (Order.)  Plaintiff then amended its complaint.  (Docket
No. 30.)  Thereafter, the parties stipulated to a second amended
complaint, which dropped the Equal Protection and Uncompensated
Taking claims.  (SAC.)  The second amended complaint is the
operative complaint.  The City did not move to dismiss the second
amended complaint.

affirmative act, the court still lacks jurisdiction to adjudicate it.[4]  Accordingly, the court will dismiss plaintiff's Due Process claim.

B.   <u>State-Created Danger</u> (Claim 2)

Plaintiff also alleges that the City committed affirmative acts that placed plaintiff at risk of danger, and accordingly invokes the state-created danger doctrine.  The state-created danger doctrine provides an exception to the general rule denying plaintiffs standing to sue the government for failure to act against third parties.  Specifically, it opens the government to liability for a failure to act against a third party if the plaintiff can show that (1) the government, by some affirmative conduct, exposed the plaintiff to danger from that third party, and (2) the affirmative conduct was with "deliberate indifference to a known or obvious danger."  <u>Murguia v. Langdon</u>, 61 F.4th 1096, 1111 (9th Cir. 2023); <u>Patel v. Kent Sch. Dist.</u>, 648 F.3d 965, 974 (9th Cir. 2011)).

1.   <u>Applicability of State-Created Danger Doctrine</u>

Before challenging the merits of plaintiff's state-created danger argument, the City argues that there is no triable issue as to a state-created danger because neither party is an individual.  (MSJ at 9.)  This argument lacks merit.  First, "[a] corporation has rights under the Fourteenth Amendment and may bring § 1983 claims when its rights are violated."  <u>SOC, Inc. v.</u>

---

    [4]   Any allegations of affirmative acts or concerted policies of inaction are properly raised under plaintiff's state-created danger and <u>Monell</u> claims, respectively, and are addressed below.

1    Las Vegas Metro. Police Dep't, 319 F. App'x 488, 489–90 (9th Cir.

2    2009) (recognizing corporate right to occupational liberty).  See

3    also Grosjean v. Am. Press Co., 297 U.S. 233, 244 (1936) ("[A]

4    corporation is a 'person' within the meaning of the equal

5    protection and due process of law clauses [of the Fourteenth

6    Amendment] . . . .").  The court is not aware of, and the City

7    fails to provide, any authority that suspends these rights upon

8    invocation of the state-created danger doctrine.

9         Second, "municipalities and other local government

10   units . . . [are] among those persons to whom § 1983 applies."

11   Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978); see

12   also Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997);

13   Hyun Ju Park v. City & Cnty. of Honolulu, 952 F.3d 1136, 1141

14   (9th Cir. 2020) ("A municipality may be held liable as a 'person'

15   under 42 U.S.C. § 1983 when it maintains a policy or custom that

16   causes the deprivation of a plaintiff's federally protected

17   rights.").  The City offers no arguments why an application of

18   the state-created danger doctrine exempts state entities from the

19   class of persons to whom § 1983 applies.  See also Sinclair v.

20   City of Seattle, 61 F.4th 674 (9th Cir. 2023) (affirming

21   recognition and denial on merits of plaintiff's claim against

22   city under state-created danger doctrine); Reed v. City of

23   Emeryville, 568 F. Supp. 3d 1029 (N.D. Cal. 2021) (recognizing

24   and denying on merits the same).

25        Accordingly, the court will proceed to the merits of

26   plaintiff's state-created danger claim.

27             2.   Affirmative Acts

28        Plaintiff alleges that the City placed plaintiff in a

10

1  more dangerous position than it otherwise would have faced by the

2  following affirmative acts: (1) opening and then closing a

3  homeless shelter along Railroad Drive; (2) providing sustenance

4  and support to homeless individuals residing near Railroad Drive;

5  and (3) affirmatively refusing to enforce laws along Railroad

6  Drive, essentially designating it a "containment zone."  (See

7  generally Opp'n (Docket No. 5).)  The court addresses each in

8  turn.

9              i.   Homeless Shelter

10      Plaintiff fails to show that there is a triable issue

11  on whether the City closed the homeless shelter with deliberate

12  indifference to a known or obvious danger to plaintiff.

13  Deliberate indifference is "a stringent standard of fault,

14  requiring proof that a municipal actor disregarded a known or

15  obvious consequence of his action."  Bryan Cnty. v. Brown, 520

16  U.S. 397, 410 (1997).  See also Patel v. Kent Sch. Dist., 648

17  F.3d 965, 974 (9th Cir. 2011) ("deliberate indifference requires

18  a culpable mental state.") (citing L.W. v. Grubbs, 92 F.3d 894,

19  898-900 (9th Cir. 1996)).  The state actor must "actually intend[

20  ] to expose the plaintiff to such risks without regard to the

21  consequences to the plaintiff."  Grubbs, 92 F.3d at 899 (internal

22  quotation marks omitted).

23      In this case, even assuming the City's actual knowledge

24  of the condition that would befall Railroad Drive upon the

25  shelter's closure, plaintiff fails to establish a genuine issue

26  of deliberate indifference because it introduces no evidence

27  probative of the City's "culpable mental state" regarding the

28  shelter's closure.  See Patel, 638 F.3d at 974.  In fact,

11

1  plaintiff offers no evidence at all even bearing on the question

2  of why the City closed the shelter.  See Hunters Cap., LLC v.

3  City of Seattle, 650 F. Supp. 3d 1187 (W.D. Wash. 2023) (granting

4  summary judgment in part because "Plaintiffs have presented no

5  evidence from which a reasonable jury could conclude that the

6  City acted with deliberate indifference to expose Plaintiffs to

7  certain unreasonable risks, and actually intended to expose them

8  to such risks, without regard to the consequences to them.").

9      Accordingly, the City's closing of the shelter cannot

10  serve as the factual predicate for plaintiff's state-created

11  danger claim.

12          ii.  Sustenance/Support

13      No reasonable trier of fact could conclude that DCR's

14  provision of trash bags and water bottles to the homeless placed

15  plaintiff in greater danger.  Providing trash bags to homeless

16  individuals who express a desire to clean up after themselves in

17  fact implies the mitigation of the precise kind of danger for

18  which plaintiff seeks to hold the City accountable.

19      Even if the court were to construe this form of aid as

20  a danger to plaintiff, plaintiff submits no evidence that the

21  City's policy of providing trash bags and water bottles and

22  allowing non-profit private entities to give homeless individuals

23  food and other comfort is anything other than a generalized

24  policy applicable across Sacramento, as opposed to applicable

25  specifically to the homeless population around plaintiff's

26  property.  See Sinclair v. City of Seattle, 61 F.4th 674, 682

27  (9th Cir. 2023) ("[A]ny danger the City created or contributed to

28  . . . affected all [] visitors [to city precinct] equally; the

1    danger was not specifically directed at [plaintiffs]" and claim
2    therefore dismissed).

3         Accordingly, there is no genuine issue as to whether
4    such generalized, rudimentary aid can ground a successful state-
5    created danger claim.

6                     iii. Affirmative Non-Enforcement

7         As the court previously explained in its order
8    dismissing the original complaint, "[i]nserting the word
9    'refusal' . . . does not transform an omission into an
10   affirmative act." Estate of Gonzales v. Hickman, ED 05-cv-660
11   MMM (RCx), 2006 WL 4959780, at *14 (C.D. Cal. Jan. 30, 2006).
12   Ninth Circuit precedent recognizing claims for state-created
13   danger makes clear that the official conduct in question must be
14   affirmative in a more literal sense. See, e.g., Hernandez v.
15   City of San Jose, 897 F.3d 1125, 1133-35 (9th Cir. 2018)
16   (directing rally attendees toward violent crowd and then
17   physically blocking them). To the extent that plaintiff shows
18   instances of the City refusing or failing to respond to its
19   requests for code enforcement, they cannot support a state-
20   created danger claim as a matter of law.[5]

21        [5]    Such a showing would also preclude standing to sue, as
22   discussed in the standing analysis regarding plaintiff's first
     claim, supra, at § IV.A.  However, a concerted policy or custom
23   of inaction may be an affirmative act for which the City may be
     liable.  See Brown v. Lynch, 831 F.3d 1146, 1152 (9th Cir. 2016)
24   ("A 'policy' is a deliberate choice to follow a course of action
     . . . . A plaintiff can prevail by pointing to both policies of
25   'action' and of 'inaction.'") (citations omitted); Horton by
     Horton v. City of Santa Maria, 915 F.3d 592, 604 (9th Cir. 2019)
26   ("[C]onstitutional deprivations may occur not . . . as a result
27   of actions of the individual officers, but as a result of the
     collective inaction of the municipal defendant.") (citations
28   omitted).  To the extent that plaintiff alleges a sustained,

                                    13

1   Accordingly, the court will grant summary judgment on

2   this claim.

3   C.   <u>Municipal Liability for Custom or Practice</u> (Claim 3)

4   "In order to establish municipal liability, a plaintiff

5   must show that a 'policy or custom' led to the plaintiff's

6   injury."  <u>Castro v. Cnty. of Los Angeles</u>, 833 F.3d 1060, 1073

7   (9th Cir. 2016) (en banc) (quoting <u>Monell v. Dep't of Soc.</u>

8   <u>Servs.</u>, 436 U.S. 658, 694 (1978)).  <u>See also</u> <u>Gordon v. Cnty. of</u>

9   <u>Orange</u>, 6 F.4th 961, 974 (9th Cir. 2021) ("An unconstitutional

10  policy need not be formal or written to create municipal

11  liability under Section 1983; however, it must be so permanent

12  and well settled as to constitute a custom or usage with the

13  force of law.") (internal quotation marks and citation omitted).

14  Plaintiff alleges that the City adopted a policy of

15  non-enforcement around plaintiff's property, compelled by the

16  City's interpretation of the Ninth Circuit case <u>Martin v. City of</u>

17  <u>Boise</u>, 902 F.3d 1031 (9th Cir. 2018), <u>opinion amended and</u>

18  <u>superseded on denial of reh'g</u>, 920 F.3d 584 (9th Cir. 2019).[6]

19  (Opp'n at 8.)  However, the undisputed facts do not permit a

20  reasonable factfinder to conclude that the City adopted a policy

21  to categorically "preclude[] it from prosecuting any homeless

22  persons or even being able to relocate the homeless persons

23

24  affirmative policy or custom of inaction, the court addresses it
    in its discussion of plaintiff's <u>Monell</u> claim below.

25      [6]   The Ninth Circuit in <u>Martin</u> held, in relevant part,

26  that "the Eighth Amendment prohibits the imposition of criminal
    penalties for sitting, sleeping, or lying outside on public

27  property for homeless individuals who cannot obtain shelter."
    <u>Id.</u> at 1048.

28

outside of the area surrounding Railroad Drive or to clean up the debris, including abandoned and burned vehicles, left in their wake."[7]  (See Eaton Decl. ¶ 8.)  While the City might not be doing as much as plaintiff would reasonably expect it to do in prosecuting crimes committed by homeless persons, the undisputed facts show that the City has in place official policies for triaging and prioritizing the countless complaints it receives from its citizens stemming from the homelessness crisis, with resolutions up to and including clearing encampments and towing vehicles deemed to be a nuisance.[8]  (See Worrall Decl. ¶¶ 7-8 and

---

[7]     Plaintiff also cites to its correspondence with Sacramento Police Sergeant William Wann for the proposition that the City, pursuant to Martin, directed all of its enforcement agencies "to stop policing and enforcing the laws around Plaintiff's Property."  (Opp'n at 15 (Wann writing "Soon, I think we will be sending social workers out to try to connect the campers with services and my team will only be needed when there is a nexus to some criminal activity.  We are pretty much there now.").)  In context, Wann merely informs plaintiff of the Police Department's shrinking purview ("Code Enforcement, Parking Enforcement, Animal Control, Arson Investigations and probably more stuff is not part of the Police Department") and explains that "I think the days are gone in which we consider tents to be a police problem if they are only an eye sore."  (Eaton Decl. Ex. 4, 1900RR_000900 (emphasis added).)  He further explains that if tents are on plaintiff's private property, then the Police Department will help remove them.  (Id.)

[8]     At best, plaintiff's evidence shows that Sacramento politicians use Martin to deflect complaints from its constituents about inadequate code enforcement.  (See Eaton Decl. Ex. 2, RR1900_000184 (email from mayor's office stating "Martin V. Boise[] places restrictions on moving people experiencing homelessness, which includes people living in their vehicles, unless there is adequate shelter space available . . . .  There are exceptions to this which include updates to essential infrastructure as well as public safety concerns."), RR1900_000186 (email from councilmember's office stating "we are still subject to the Martin v. Boise decision, which limits our ability to enforce anticamping ordinances without providing

15

1 | Exs. B, C.)

2 |       Neither do the undisputed facts permit the conclusion
3 | that the City maintained a municipal custom of inaction that
4 | rises to the level of a constitutional violation.  Instead, the
5 | record shows the City taking at least some affirmative actions to
6 | respond to plaintiff's complaints.  For example, Code Compliance
7 | responded to complaints from plaintiff about Railroad Drive on 13
8 | occasions in 2021.  (See Mendez Decl. ¶¶ 12-13.)  The record also
9 | shows, for instance, that the City conducted a vehicle sweep of
10 | Railroad Drive on January 2021, during which several vehicles
11 | were either towed, marked for tow, or voluntarily removed (see
12 | Eaton Decl. Ex. 4, 1900RR_000420); removed an abandoned vehicle
13 | from the Railroad Drive cul-de-sac on December 2020 (see id.,
14 | 1900RR_000490); and had Jose Mendez, Code Enforcement Manager for
15 | the City of Sacramento, respond personally to plaintiff's
16 | complaints and promise to send code enforcement officers out to
17 | Railroad Drive (see id., 1900RR_000545; see also Mendez Decl. ¶
18 | 13).

19 |       These responses may be far from what plaintiff had a
20 | right to expect from the City for its tax dollars, but they
21 | negate any contention that the City was accustomed to inaction
22 | "so permanent and well settled as to constitute a custom or usage
23 | with the force of law."  Gordon, 6 F.4th at 974.  Accordingly,
24 | there is no triable issue on whether the City implemented an
25 | unconstitutional policy or custom of non-enforcement pursuant to
26 | Monell, and the court will grant summary judgment on this claim.

27 |
28 | shelter options for the unhoused population.").)

16

1    D.   <u>State Law Claims</u> (Claims 4-7)

2         After initially dismissing plaintiff's federal claims,

3    the court concluded that the balance of judicial economy,

4    convenience, fairness, and comity factors weighed strongly in

5    favor of declining supplemental jurisdiction over plaintiff's

6    state law claims.  (<u>See</u> Order at 14-15; <u>see also</u> <u>Carnegie-Mellon</u>

7    <u>Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988).)  Nothing since

8    has changed significantly to disturb this analysis, including the

9    still-predominant comity interest in referring decisions on

10   complex questions of California statutory and constitutional law

11   to California courts.[9]  Accordingly, the court will again decline

12   supplemental jurisdiction over plaintiff's state law claims

13   pursuant to 28 U.S.C. § 1367(c).

14        IT IS THEREFORE ORDERED that the City's motion for

15   summary judgment be, and the same hereby is, GRANTED on its

16   federal claims brought under Section 1983 (Claims 1-3).  Claims

17   4-7 are DISMISSED pursuant to the provisions of 28 U.S.C. §

18   1367(c), without prejudice to plaintiff's right to refile its

19   remaining state law claims in state court.

20   Dated:  November 14, 2023

21   WILLIAM B. SHUBB
     UNITED STATES DISTRICT JUDGE

---

26        [9]   See also <u>California v. Sacramento</u>, No. 23-cv-8658
     (Sacramento Super. Ct. Sept. 19, 2023), filed by the Sacramento
27   County District Attorney against the City and bringing similar
     state law claims in response to Sacramento's homelessness crisis.

28

17